
1  Law Offices of Tracy T. Woo
   Tracy T. Woo, (SBN 310384)
2  777 E. Tahquitz Canyon Way,
   Suite 200-138
3  Palm Springs, CA 92262
   Telephone: (760)851-0901
4  Email: Tracywoolaw@icloud.com

5  Attorney for Plaintiff Amy Cox

6

7             UNITED STATES DISTRICT COURT

8             CENTRAL DISTRICT OF CALIFORNIA

9

10 | AMY COX, an individual,                          | ) Case No. 5:17-CV-001580 |
11 |                                                  | ) |
   |        Plaintiff,                                | ) COMPLAINT FOR: |
12 |                                                  | ) |
   |   vs.                                            | ) 1. RESCISSION, DAMAGES, CIVIL |
13 |                                                  | )    PENALTIES AND ATTORNEYS FEES |
   | LB LENDING, LLC, a Nevada limited liability      | )    UNDER TRUTH-IN-LENDING ACT |
14 | company; and MACOY CAPITAL PARTNERS,             | ) |
   | INC., a California corporation; WATERFALL        | ) |
15 | ASSET MANAGEMENT, LLC, a Delaware                | ) 2. INJUNCTION, RESTITUTION AND |
   | corporation.                                     | )    OTHER RELIEF UNDER CALIFORNIA |
16 |                                                  | )    UNFAIR PRACTICES ACT, BUSINESS |
   |        Defendants.                               | )    AND PROFESSIONS CODE SECTION |
17 |                                                  | ) |

18     3. FRAUD

19     4. BREACH OF FIDUCIARY DUTY

20     5. NEGLIGENCE

21
22            DEMAND FOR JURY TRIAL

23

24

25

26

27

28

1

## JURISDICTION

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. section 1331 (federal question jurisdiction) and 15 U.S.C. section 1640(e) (TILA jurisdiction). This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. section 1367(a) (supplemental jurisdiction), in that the state law claims are based on the same conduct as the federal claims and are so related that they form part of the same case or controversy.

## VENUE AND INTRA-DISTRICT ASSIGNMENT

2. Pursuant to 28 U.S.C. section 1391(b)(2), venue is proper in the U.S. District Court for the Central District of California because Plaintiff entered into the mortgage loans that are the subject of this lawsuit in Riverside County, California, and the events or omissions giving rise to Plaintiff's claims occurred in Riverside County, California.

## PARTIES

3. Plaintiff, AMY COX is a natural person residing in Palm Springs, California, ("Plaintiff"). Plaintiff's principal place of residence is 319 Westlake Terrace, Palm Springs, CA 92264 (the "Residence").

4. Defendant LB LENDING, LLC is a Nevada limited liability company doing business in the County of Riverside, California, ("Defendant LB Lending").

5. Defendant Macoy Capital Partners, Inc. is a California corporation doing business in the County of Riverside, California, ("Defendant Macoy Capital");

6. Plaintiff is informed and believes and upon such information and belief alleges that Defendant Macoy Capital Partners was the agent, servants, and/or co-conspirators of Defendant LB Lending, and was acting within the course and scope of said agency and/or conspiracy.

7. Upon information and belief, Defendant Waterfall Asset Management, LLC, is a Delaware Corporation, by and through Defendant LB Lending, its wholly owned subsidiary and/or its alter ego, is doing business in the County of Riverside, California.

8. At all times relevant hereto, Defendants regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments, and are the entities to whom the transactions which are the subject of this action are initially payable, making Defendants each a "creditor" within the meaning of and subject to compliance with the Truth In Lending Act ("TILA"), 15 U.S.C. § 1602(f) and Regulation Z §1026.2(a)(17).

## GENERAL FACTUAL ALLEGATIONS

9. On or before February 2011, Plaintiff was approached by Defendant Macoy Capital to extend Plaintiff's then existing loan with Jerome M. Covin, Trustee of the Covin Family Trust (the "Covin Loan").

10. The Covin Loan was set to expire on May 31, 2011, but Defendant Macoy Capital orchestrated an extension to May 31, 2013.

11. Before the Covin Loan was to mature on May 31, 2013, Plaintiff requested that Defendant Macoy Capital look into refinancing the Covin loan with a traditional home loan. Specifically, in or around July 30, 2012, Plaintiff requested that Defendant Macoy Capital try to refinance her Residence with a 30-year fixed term and at a lower rate.

12. Defendant Macoy Capital ignored the request and instead arranged for a one-year loan with Defendant LB Lending (fka Lincoln Berger), effective on or about August 2012 ("Loan 1"). Loan 1 closed on or about October 5, 2012. Defendants sent to Plaintiff the Loan 1 documents only two days before the October 5, 2012 closing date. Prior to closing Loan 1 with LB Lending, Plaintiff requested a 24-month term, but that did not happen as Plaintiff was told she would simply have to refinance Loan 1 in 12 months.

13. In essence, on or around September 2012, Plaintiff obtained from Defendants, as "creditors," a consumer loan in the amount of $180,000.00 secured by a deed of trust on the Residence (i.e., Loan 1). The purpose of the Loan was to refinance

the Covin Loan and for other personal, family or household purposes, and the proceeds were used as such.

14. In early to mid-August 2013, and prior to Loan 1 maturing on August 31, 2013, Defendant Macoy Capital orchestrated an extension of Loan 1's maturity date of August 31, 2013 to August 31, 2015. The extension did not occur until well after the August 31, 2013 maturity date. Prior to closing on the Loan 1 extension, Plaintiff requested in September 2013 if she could get a "traditional loan" (i.e., a 30-year loan with a lower interest rate). Defendant Macoy Capital ignored the Plaintiff's request for a traditional loan.

15. Defendants did not give Plaintiff the extension documents until well after the initial maturity date of August 31, 2013 for Loan 1. Defendants thus backdated all documents related to the extension of Loan 1. That is, Defendants did not provide Plaintiff with the loan extension documents until sometime on or about September 24, 2013, and Defendant Macoy Capital directed Plaintiff to sign them immediately and return via overnight mail. Defendants knew or should have known that since the initial maturity date of August 31, 2013 had passed, that Plaintiff had limited options but to sign the extension. Loan 1 was thus amended to extend the maturity date of Loan 1 from August 31, 2013 to August 31, 2015.

16. During the entire process of Loan 1, including the amendment thereto, Defendants provided Plaintiff with several loan documents, including: (i) a Promissory Note for $180,000.00, (ii) an Occupancy Affidavit And Financial Status; and (iii) a Deed of Trust With Assignment of Rents, Security Agreements And Fixture Filings, (the "Deed of Trust").

17. The Deed of Trust would be used to secure Loan 1 with Plaintiff's property, where Plaintiff lives as her principal residence. Plaintiff made clear and Defendants knew or should have known that Plaintiff's property used to secure Loan 1 was her principal residence.

Case 5:17-cv-01580-JGB-SP    Document 1    Filed 08/04/17    Page 5 of 19    Page ID #:5

18. The terms of Loan 1 for a principal amount of $180,000.00 was initially for a term of 12 months (maturing in August 2013) at an annual interest rate of 8.5%, but the term was later extended for another 24 months (maturing in August 2015) at the same annual interest rate of 8.5%.

19. Defendants did not ascertain Plaintiff's eligibility for or ability to repay Loan 1. Defendants did not ask Defendant for, nor did Defendants receive, any financial or employment information.

20. Plaintiff was not provided any documents in anticipation of executing the documents for Loan 1. They were all given to her for immediate execution with closing to take place within two days. After executing the Loan documents, Plaintiff was not provided any documents nor mandatory disclosures for Loan 1.

21. In fact, the day prior to the date for signing the loan documents was when Plaintiff learned for the first time in an email from Defendant Macoy Capital that the interest rate for the loan would be 8.5%, despite Plaintiff's prior repeated requests for a traditional home loan (longer term with lower interest rate). Only 2 days before signing the loan documents did Plaintiff learn that the terms of Loan 1 included the obligation to pay from the proceeds of the Loan the following: a 1% cash point for an origination fee to Defendant LB Lending of $1,800.00; a 2% cash point for a broker fee of $3,600.00 to Defendant Macoy Capital; cash to Defendant Macoy Capital for cost of so-called Disclosure/Docs of $650.00; cash for Prepaid Interest of $167.67; cash for title, taxes and recording charge of $561.00; cash for escrow charges of $610.00; and a balloon payment for the full loan amount that would be due on August 30, 2015. The Loan also provided a default rate of 17.99%. When taking into consideration all of the above, the Loan is more than 6.5 points above the federal Average Prime Rate Offer, and was thus a "high cost" or HOEPA loan governed by 15 C.F.R. Section 1026.35 of Regulation Z.

22. At or around closing of Loan 1, Plaintiff in glancing through the documents, saw that the documents mentioned that Loan 1 was for a business purpose.

5

Thereupon, Plaintiff immediately informed Defendants that the proceeds would be used to refinance the prior loan on her Residence, and the net proceeds to her would be used for personal, family and/or household purposes. Defendants responded along the lines with "don't worry about it; it's just language that we have to use".

23. Relying upon Defendants' response, Plaintiff signed the documents for Loan 1.

24. Well after closing on Loan 1 and upon review of the Note evidencing the Loan, Plaintiff learned:

(a) The Note provided for an increase in the interest rate by 5% by way of a service fee for any payment late by more than ten (10) calendar days;

(b) The Note further provided for an increase in the interest rate by 2% by way of a service fee if the unpaid principal balance due at the maturity date is late; and

(c) The Note further provided for an increase in the interest rate to at least 17.99% upon the occurrence of an event of default;

25. Defendants knew that Loan 1 was about to mature in August 2015, and prior to then, Defendant Macoy Capital informed Plaintiff that Defendant LB Lending would refinance its Loan 1 with a new loan.

26. On or about June 10, 2015, Plaintiff obtained from Defendant LB Lending and Defendant Macoy Capital (collectively, "Defendants), as "creditors", another consumer loan in the amount of $270,000.00, secured by a deed of trust on the Residence ("Loan 2"). The purpose of the Loan was for personal, family or household purposes, and the proceeds were used as such.

27. During the process of Loan 2, Defendants provided Plaintiff with several loan documents around two days before closing, including: (i) a Promissory Note for $270,000.00, dated June 9, 2015, (ii) an Occupancy Affidavit and Financial Status, and (iii) a Deed of Trust With Assignment of Rents, Security Agreements And Fixture Filings, dated June 9, 2015 (the "2015 Deed of Trust"). On or about August 26, 2015, well after closing on Loan 2, Defendants then provided Plaintiff, for the first time, a

Borrower Agreement to sign. Plaintiff eventually signed and returned to Defendants the Borrower Agreement on or about September 13, 2015.

28. The Deed of Trust would be used to secure Loan 2 with Plaintiff's Residence, where Plaintiff lives as her principal place of dwelling.

29. The terms of Loan 2 were for a principal amount of $270,000.00, and payable within 24 months at an annual interest rate of 8.5%. The Loan also provides a default rate of 17.99%. When taking into consideration all of the above, the annual percentage rate was more than 6.5 points higher than the federal Average Prime Rate Offer and was thus a "high cost" or HOEPA loan under Regulation Z.

30. Defendants did not ascertain Plaintiff's eligibility for or ability to repay Loan 2. Defendants did not ask Defendant for, nor did Defendants receive, any financial or employment information, even though Plaintiff informed Defendants that she was unemployed and was looking for employment.

31. Plaintiff was not provided any documents in anticipation of executing the documents for Loan 2. They were all given to her for immediate execution with closing to take place within a day or two. After executing the Loan documents, Plaintiff was not provided any documents nor mandatory disclosures for Loan 2.

32. Only at closing did Plaintiff learn that the terms of Loan 2 included the obligation to pay from the proceeds of the Loan the following: a 1% cash point for an origination fee to Defendant LB Lending of $2,700.00; a 2% cash point for a broker fee of $5,400.00 to Defendant Macoy Capital; cash for processing fee of $350.00 to Defendant Macoy Capital; cash for attorneys' fees and cost for Defendant Macoy Capital's attorneys of $1,500.00; cash for Prepaid Interest of $1,275.00; cash for title, taxes and recording charge of $945.00; cash for escrow charges of $935.00; interest on the entire principal at the rate of 8.5% per annum with a balloon payment due on June 8, 2017, 2015.

33. Well after closing on Loan 2 and upon review of the Note evidencing the Loan, Plaintiff learned:

    (a) The Note provided for an increase in the interest rate by 5% by way of a service fee for any payment late by more than ten (10) calendar days;

    (b) The Note further provided for an increase in the interest rate by 2% by way of a service fee if the unpaid principal balance due at the maturity date is late; and

    (c) The Note further provided for an increase in the interest rate to at least 17% upon the occurrence of an event of default;

34. Under both Loans 1 and 2, it is possible that the borrower would have an interest rate of up to 17% plus pay fees and penalties of another 7% at any time during the term on of the Loan.

35. The scheme that Defendants put into action was to create sham business loans in an effort to avoid consumer protection laws such as TILA, Regulation Z, and other applicable laws. Defendants knew or should have known that: (a) the Plaintiff's Residence, which was the property used to secure Loans 1 and 2 (collectively, the "Loans") by LB Lending to Plaintiff, was Plaintiff's principal place of residence; (b) that the Loans were for refinancing purposes and not for business/investment purposes; (c) Plaintiff was unemployed at the time of Loan 2, and had effectively no income at the time of Loan 1.

36. Defendants intentionally and/or negligently cloaked the Loans as business loans when in fact these were consumer loans secured by Plaintiff's Residence. Defendants intentionally and/or negligently did so to avoid giving the proper disclosures and affording Plaintiff the proper protections under TILA, Regulation Z, and other applicable laws.

37. Defendants' scheme to cloak consumer loans as business loans began when Defendants knew or should have known that Plaintiff desperately needed to refinance the Covin Loan, and subsequently the Loans with Defendant LB Lending, as she did not have the financial means to pay off any of those loans upon their respective maturity. Defendants, in essence, placed Plaintiff in a spiral of perpetual short-term high-interest loans. Nevertheless, in an effort to skirt the consumer protection laws such as TILA,

Regulation Z, Cal. Bus. & Prof. Code, and other laws, Defendants waited until after the prior loans had matured and then sent Plaintiff loan documents, asking her to sign them immediately. Defendants knew or should have known that such timing put Plaintiff at an incredible disadvantage as she needed to refinance loans that had already matured, or risk losing her home.

38. On or about June 7, 2017, Defendants' attorney sent a demand letter to Plaintiff saying the Plaintiff is in default on the Note to Defendant LB Lending.

39. On or about June 16, 2017, Plaintiff sent a notice of rescission under TILA to Defendants and expressed a willingness to repay Defendants the amount Plaintiff would owe as a result of rescission. Within 20 days of the notice of rescission, Defendants LB Lending and Waterfall Asset Management, failed and continue to fail to release their security interest in Plaintiff's Residence as required under TILA or to otherwise cooperate in accomplishing the rescission.

## FIRST CLAIM

(For Violation of Federal Truth-in-Lending Act, 15 U.S.C. § 1601 et seq.)

40. Plaintiff is a "consumer" within the meaning of Federal Reserve Regulation Z (hereinafter "Regulation Z," 12 C.F.R. § 1026.2(a)(1) with respect to the loan transactions described in this Complaint.

41. At all relevant times, Defendant LB Lending was a "creditor" within the meaning of Regulation Z, 12 C.F.R. § 1026.2(a)(17) and as defined in 15 U.S.C. § 1602(g) of the Truth-in-Lending Act ("TILA"), in that Defendant LB Lending: (1) regularly extended consumer credit in the form of mortgage loans that were payable in more than four installments and for which the payment of a finance charge was required; and (2) was the "person" to which those mortgage loans were initially payable.

42. On or about May 8, 2009 and ever since then, Plaintiff had an "ownership interest" (within the meaning of Regulation Z, 12 C.F.R. §1026.23(a)) in the real property located at 319 Westlake Terrace, Palm Springs, CA 92264 (the "Residence").

At all relevant times, the Residence was Plaintiff's "principal dwelling" within the meaning of Regulation Z, 12 C.F.R. §1026.23(a).

43. At all relevant times, Defendant LB Lending's agent, Defendant Macoy Capital were "loan originators" as defined in 12 C.F.R. § 1026.36(a) of Regulation Z, in that Defendant Macoy Capital, by and through its employees and/or agents, Mitch Ohlbaum and David Rosenberg, were persons who, for compensation or other monetary gain, or in expectation of compensation or other monetary gain, arranged, negotiated, or otherwise obtained an extension of consumer credit for another person, including Plaintiff.

44. The Loans originated by Defendant Macoy Capital on behalf of Plaintiff were secured by a "dwelling" as defined by 15 U.S.C. §1602(w) of TILA, in that they were residential structures or mobile homes that contained one to four family housing units or individual units of condominiums or cooperatives.

45. Under the Truth-in-Lending Act, 15 U.S.C. § 1635 and Regulation Z, 12 C.F.R. § 1026.23, Defendants were required to provide Plaintiff with a prescribed form of notice of Plaintiff's three-day right to cancel the Loans. Defendants failed to comply with Section 1635.

46. Under the Truth-in-Lending Act, 15 U.S.C. § 1638 and Regulation Z, 12 C.F.R. § 1026.18, Defendants were required to provide Plaintiff with a prescribed form of notice and disclosure of the material terms of the Loans, including the annual percentage rate, finance charge, amount financed, total of payments, payment schedule, the security interest Defendants were retaining and other information. Defendants failed to comply with Sections 1638 and 1026.18. No disclosures were provided.

47. Regulation Z required the Defendants, and each of them to consider, document and verify Plaintiff's ability to repay the Loans, none of which Defendants even started to do. 12 C.F.R. §1026.43(c)(5). As mentioned above, Plaintiff was unemployed at the time of Loan 2, and had effectively no income at the time of Loan 1.

48. In calculating a borrower's ability to repay a loan such as Loan 1 and Loan 2, a creditor is required by Regulation Z to assume that the borrower's monthly payments are equal to any balloon payment. Special rules apply for loans with a balloon payment, interest-only loans, and negative amortization loans. A creditor must make the consideration required under paragraph (c)(2)(iii) of this section for: (A) a loan with a balloon payment, as defined in § 1026.18(s)(5)(i), using: (1) The maximum payment scheduled during the first five years after the date on which the first regular periodic payment will be due for a loan that is not a higher-priced covered transaction; or (2) The maximum payment in the payment schedule, including any balloon payment, for a higher-priced covered transaction.

49. The Loans were "high cost" loans that were arranged through the services of Defendant Macoy Capital, a mortgage broker. A "high-cost loan" is defined as any consumer home loan where the annual percentage rate ("APR") exceeds 6.5 percentage points over the average prime rate offer index in a case of a first lien transaction. 12. C.F.R. 1026.35. Here, the Loans had an effective APR at or above 10.5%, and at all relevant times the average prime rate offer index ranged from 3.04 to 3.24%.

50. Because the Loans were high cost, Regulation Z's Home Owner Equity Protection Act provisions ("HOEPA") required additional disclosures at least three days before consummation of the transaction. (15 U.S.C. § 1639(b)(1).) Substantively, HOEPA generally precludes any prepayment penalty provision in the loan (15 U.S.C. § 1639(c)), prohibits increases in the interest rate charged following any default (id., § 1639(d)), and bars negative amortization (id., § 1639(f)) and more than 2 prepaid monthly payments (id., § 1639(g)). Most importantly, HOEPA requires that a lender consider a borrower's ability to repay a loan. Any failure of the creditor to comply with the requirements of HOEPA is treated as a failure to deliver material disclosures, thereby triggering the debtor's right to rescind. (15 U.S.C. § 1639(j).) Defendants, and each of them failed to comply with any aspects of HOEPA.

51. Because the annual percentage rate exceeded 6.5 points over the Average Prime Rate Offer threshold under HOEPA amendments to TILA, codified at 15 U.S.C. §1639, Defendants were required to provide Plaintiff with a prescribed form of notice and early waiting period before the Plaintiff became obligated under any loan contracts. No notice or waiting period was provided. In addition, because the loans were subject to HOEPA, Defendants were prohibited from inserting into the promissory notes any provision for a balloon payment and from making a loan without considering the ability of Plaintiff to repay the same. Defendants violated both aspects of HOEPA. Because the annual percentage rate of the Loans exceeded 6.5 points over the Average Prime Rate Offer threshold under the Regulation Z and were thus "high cost" loans, Defendants were required to provide Plaintiff with a prescribed form of notice and early waiting period before the Plaintiff became obligated under any loan contracts. See 12 C.F.R. §1026.35. Defendants failed to do so.

52. Because the balloon payment called for in the note in Loan 1 was $180,000.00, Plaintiff would have had to ascertain that Plaintiff had a monthly income sufficient to make a monthly mortgage payment of $180,000.00, which of course, Plaintiff did not even come close to having.

53. Similarly, because the balloon payment called for in the note in Loan 2 was $270,000.00, Plaintiff would have had to ascertain that Plaintiffs had a monthly income sufficient to make a monthly mortgage payment of $270,000.00, which of course, Plaintiff did not even come close to having.

54. As a result of the above violations of TILA, this complaint again serves as notice under 15 U.S.C. Section 1635 that Plaintiff demands rescission of the Loan against Defendants, and each of them. By operation of law the deed of trust upon the Property is now void and Defendants have a legal obligation to reflect that it has been eliminated as a lien on Plaintiff's home.

55. As a result of the above violations of TILA, on June 16, 2017, Plaintiff served on Defendants notice of Plaintiff's election to rescind Loan 2. Defendants failed and refused to comply with the rescission request or to perform their obligations under TILA. In contravention of their obligations under TILA to reconvey the Deed of Trust, Defendants have threatened to file a Notice of Default and to take other action to attempt to enforce the now void Deed of Trust for the Loans.

56. Plaintiff is entitled to the following relief by reason of the foregoing violations of TILA by Defendants: (1) an order confirming that Plaintiff has validly rescinded Loans 1 and 2 and has the right to repay the principal of the Loans with credit for all finance charges and payments Plaintiff has made, (2) statutory damages for violation of HOEPA equal to the sum of all finance charges in the Loan transactions, (3) a civil penalty of $2,000 each for Defendants' wrongful refusal to recognize Plaintiff's June 16, 2017 rescission demand, (4) civil penalties and damages for violation of HOEPA and TILA's disclosure regime, and (5) statutory attorneys' fees at a multiple to be determined by motion.

## SECOND CLAIM

### (Unfair Business Practices)

57. Plaintiff incorporates by this reference all earlier paragraphs.

58. Plaintiff alleges on information and belief that within four years past and continuing until the present time Defendants engaged in and are engaging in business practices which are unfair, deceptive, untrue and/or fraudulent within the meaning of California Business and Professions Code Section 17200 et seq., in that Defendants regularly violated TILA and HOEPA in the Loans transactions with consumers.

59. By reason of the foregoing unfair business practices Plaintiff seeks the following relief:

(a) Temporary, preliminary and permanent injunctive relief restraining Defendants' future violation of the complained of business practices;

    (b) Restitution of interest, fees, finance charges and other amounts paid by Plaintiff to Defendants during the last four years; and,

    (c) An order giving Plaintiff her rights under TILA and HOEPA by reason of the violations of those sections by Defendants.

## THIRD CLAIM

### (Fraud)

60. Plaintiff incorporates by this reference all earlier paragraphs.

61. At all relevant times, Plaintiff's purpose for Loans 1 and 2 with Defendant LB Lending was to refinance the prior Covin Loan, which was secured by her Residence, and to provide additional income for personal, family, or household purposes.

62. At the time Loan 2 was made, Plaintiff was unemployed and the net proceeds from Loan 2, after refinancing Loan 1, was so that Plaintiff could purchase daily necessities such as food, clothing, transportation, and to pay ongoing utility and HOA bills, make necessary home and car repairs, etc. Plaintiff informed Defendants of such purpose for the Loans.

63. Plaintiff informed Defendants that she did not have, at all relevant times, a business or commercial operation of any sorts, and did not understand language in the documents for the Loans that mentioned that the purpose of the Loans was for business purposes and not for personal, family, or household purposes. Whereupon, Mitch Ohlbaum and David Rosenberg, the loan officers of Defendant Macoy Capital, who in turn were the agents and representatives of Defendants LB Lending and Waterfall Asset Management, repeatedly said, "not to worry about it."

64. Defendants knew or should have known that the Loans were for personal, family, or household purposes; knew or should have known that Plaintiff did not have any business purpose for the Loans nor was Plaintiff contemplating starting any business; knew or should have known that Plaintiff was unemployed at the time of refinancing Loan 1 with Loan 2; knew or should have known that Plaintiff would rely

on its statements that Plaintiff need not worry about the language regarding the Loans for a business purpose; knew or should have known that the Loans were sham business loans and were in reality consumer loans; and that Defendant Macoy Capital intended to create such sham business loans as a way to avoid all the consumer law protection for Plaintiff.

65. Defendant Macoy Capital made such false statements with the intent to induce Plaintiff to rely on them, so that it could receive fees and commission and that Defendants LB Lending and Waterfall Asset Management would receive interest and balloon payments and fees.

66. After Loan 2 closed on or about June 10, 2015, Defendants sent Plaintiff on or about August 26, 2015, a request that she complete and sign a Borrower's Agreement. This form included the language that Loan 2 was for an investment purpose, and when asked about this, Defendants response was as before in that Plaintiff should "not worry about it." Moreover, all the forms were left blank as to what is the stated purpose of the business or investment. Defendants intentionally did not pursue this information as they knew or should have known that the purpose of the Loans was for personal, family, or household purposes.

67. Defendants also included a credit report with outdated information that showed Plaintiff living in Los Angeles, California at the time of Loan 1. That credit report was based on Plaintiff's prior home, which she sold in March 2009, well before any of the Loans were made.

68. Defendants knew or should have known that at all relevant times, Plaintiff's principal place of Residence and dwelling was at 319 Westlake Terrace, Palm Springs, California, which was the property secured by a Deed of Trust, which at all relevant times, is held by Defendant LB Lending and/or Defendant Waterfall Asset Management, as the alter ego of Defendant LB Lending.

69. Defendants knowingly concealed the fact that they had included false information about Plaintiff's purpose for the Loans, her employment status, her Residence, and Defendants falsified other related documents.

70. Plaintiff discovered Defendants' fraud upon Defendants threat to file a notice of default, at which time, Plaintiff retained counsel and reviewed the false information and documents used for Loans 1 and 2. Even if Plaintiff is held to have known or should have known of the Defendants' fraudulent conduct and/or scheme to defraud at the time of Loan 2, she is well within the three-year statute of limitations as Loan 2 was made on or about June 2015.

71. Defendants' fraud and/or scheme to defraud Plaintiff has caused damage to Plaintiff in that she would not have foregone any of the consumer protection laws afforded to her, including but not limited to her rights under TILA and Regulation Z that entitle her to rescind the Loans, obtain the Deed of Trust of her residence, and credit against the Loans' amounts all interest, fees and other costs she paid and/or incurred.

## FOURTH CLAIM

### (Breach of Fiduciary Duties)

72. Plaintiff incorporates by this reference all earlier paragraphs.

73. As the mortgage broker, Defendant Macoy Capital owes a fiduciary duty to Plaintiff, the borrower. In relevant part, California Bus. & Prof. Code section 10131, subdivision (d) defines a real estate broker as a person who, for compensation or expectation of compensation, "[s]olicits borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property or on a business opportunity." Defendant Macoy Capital by and through its employees and/or owners and/or agents, Mitch Ohlbaum and David Rosenberg, received compensation as part of Loans 1 and 2.

74. Defendant Macoy Capital breached its fiduciary duties to Plaintiff by failing to provide the proper disclosure under TILA and Regulation Z, as well as any and all other consumer law protections.

75. Defendant Macoy Capital further breached its fiduciary duties to Plaintiff by engaging in fraudulent conduct and/or being part of a scheme to defraud Plaintiff into entering into Loans 1 and 2 as sham business loans.

76. Defendant Macoy Capital's breach of its fiduciary duties to Plaintiff has caused damage to Plaintiff in that she would not have foregone any of the consumer protection laws afforded to her, including but not limited to her rights under TILA and Regulation Z that entitle her to rescind the Loans, obtain the Deed of Trust of her residence, and credit against the Loans' amounts all interest, fees and other costs she paid and/or incurred.

### FIFTH CLAIM
### (Negligence)

77. Plaintiff incorporates by this reference all earlier paragraphs.

78. Defendants owed a duty to Plaintiff by providing the proper loan disclosures under TILA and Regulation Z. Defendants breached that duty by and among: (i) failing to train and/or supervise Mitch Ohlbaum and David Rosenberg as its employees, partners, and/or agents to ensure that the proper loan documentation and disclosures for consumer loans were provided to Plaintiff; (ii) failing to have the necessary safeguards in place such as requiring that a business purpose be listed prior to closing on so-called business loans; (iii) failing to have the necessary safeguards in place to prevent its employees, partners, owners, and agents from procuring sham business loans and/or predatory consumer loans.

79. Defendants' negligence has caused damage to Plaintiff in that she would not have foregone any of the consumer protection laws afforded to her, including but not limited to her rights under TILA and Regulation Z that entitle her to rescind the Loans,

obtain the Deed of Trust of her residence, and credit against the Loans' amounts all interest, fees and other costs she paid and/or incurred.

WHEREFORE, Plaintiff prays as follows:

As to First Claim for Relief:

1. A declaration that Plaintiff has validly rescinded her Loans under the Truth in Lending Act and is entitled to the appropriate remedies flowing from such rescission;

2. For actual and statutory damages and penalties as alleged herein;

3. Statutory attorneys' fees at a multiple to be determined by motion, and

4. Actual damages in an amount to be proven at time of trial.

As to the Second Claim for Relief:

1. A reduction in the Loan balance equal to all interest and fees paid by Plaintiff for Loans 1 and 2;

2. Money damages to the extent the interest paid exceeds the remaining debt; and,

3. Three times the interest paid within the past four years.

As to the Third Claim for Relief:

1. Temporary, preliminary and permanent injunctive relief restraining Defendants' future violation of the complained of business practices;

2. Restitution of interest paid to Plaintiff who has been negatively affected by the unfair business practices during the last four years; and,

3. An order giving Plaintiff her rights under TILA and HOEPA by reason of the violations of those sections by Defendants.

As to all claims for relief:

1. Payment by Defendants to counsel for the Plaintiff of reasonable attorneys' fees by the statute sought to be enforced or alternatively, under the substantial benefit doctrine, or alternatively, under the common fund doctrine from sums collected from Defendants for distribution to injured parties;

2. Costs of the action; and

3. General relief.

Dated August 4, 2017

_____
Tracy T. Woo
Attorney for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on each of the above claims for relief.

Dated: August 4, 2017

_____
Tracy T. Woo
Attorney for Plaintiff